327 F.3d 911
 Wen-Wan CHANG; Tsung-Ming Chang; Chiao-Ying Chang; Yi Yuan Chiang; Hsien-Ming Hsieh; Shu-Chuan Hsieh; Pei-Chen Hsieh; Sung Duck Kong; Hye Ra Kong; Hyun Jung Kong; Min Suk Kong; Yei-Chien Lai; Yu Kuei Lai; Yen Chih Lai; Chen Ju Lai; Yoon Sik Lee; Jong Hee Lee; Eung Jun Lee; Sang Eun Lee; Eung Sang Lee; Cheng-Hsiung She; Hui Wen She; Tzu Ming She; Alabama Almark, LP; Alabama Bailey LP; Alabama Coosa LP; Alabama Dallas LP; Alabama Denim LP; Alabama Millry LP; Alabama Pro Sports LP; Alabama Rive Run LP; C & W Hotel LP; Delaware Milford LP; Georgia Almark LP; Louisiana Lasevilla LP; Mississippi Bass LP; Mississippi Magee LP; Mississippi MCT LP; Mississippi Neely LP, Maryland Limited Partnerships; Mississippi Tees LP, a Mississippi Limited Partnership; National Steak Restaurants LP; North Carolina K-Barb LP; North Carolina Russell-Harvelle Hosiery LP; Pennsylvania Loungewear LP; Recap Fund I LP; Recap Fund V LP; RPC Fund I LP; South Carolina Manufacturing LP; Tennessee Lafayette LP; WTC Fund I LP; United States Export Fund I LP, Maryland Limited Partnerships, Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
Wen-Wan Chang; Tsung-Ming Chang; Chiao-Ying Chang; Yi Yuan Chiang; Hsien-Ming Hsieh; Shu-Chuan Hsieh; Pei-Chen Hsieh; Sung Duck Kong; Hye Ra Kong; Hyun Jung Kong; Min Suk Kong; Yei-Chien Lai; Yu Kuei Lai; Yen Chih Lai; Chen Ju Lai; Yoon Sik Lee; Jong Hee Lee; Eung Jun Lee; Sang Eun Lee; Eung Sang Lee; Cheng-Hsiung She; Hui Wen She; Tzu Ming She; Alabama Almark, LP; Alabama Bailey LP; Alabama Coosa LP; Alabama Dallas LP; Alabama Denim LP; Alabama Millry LP; Alabama Pro Sports LP; Alabama Rive Run LP; C & W Hotel LP; Delaware Milford LP; Georgia Almark LP; Louisiana Lasevilla LP; Mississippi Bass LP; Mississippi Magee LP; Mississippi MCT LP; Mississippi Neely LP, Maryland Limited Partnerships; Mississippi Tees LP, a Mississippi Limited Partnership; National Steak Restaurants LP; North Carolina K-Barb LP; North Carolina Russell-Harvelle Hosiery LP; Pennsylvania Loungewear LP; Recap Fund I LP; Recap Fund V L; RPC Fund I LP; South Carolina Manufacturing LP; Tennessee Lafayette LP; WTC Fund I LP; United States Export Fund I LP, Maryland Limited Partnerships, Plaintiffs-Appellees,
v.
United States of America, Defendant-Appellant.
 No. 01-56266.
 No. 01-56379.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted February 10, 2003.
 Filed April 29, 2003.
 
 COPYRIGHT MATERIAL OMITTED COPYRIGHT MATERIAL OMITTED Ira J. Kurzban and Matthew Carlson, Kurzban, Kurzban, Weinger & Tetzili, Miami, FL and Marc Van Der Hout, Van Der Hout & Brigagliano, San Francisco, CA, for the plaintiff-appellant-cross-appellee.
 John C. Cunningham, Senior Litigation Counsel, and Heather Phillips, Attorney, Office of Immigration Litigation, Civil Division, U.S. Department of Justice, Washington, D.C., for the defendant-appellee-cross-appellant.
 Appeal from the United States District Court for the Central District of California; George H. King, District Judge, Presiding. D.C. No. CV-99-10518-GHK.
 Before: B. FLETCHER and HAWKINS, Circuit Judges, and BURY, District Judge.*
 BETTY B. FLETCHER, Circuit Judge.
 
 
 1
 Plaintiff-Appellants are seven "Immigrant Investors" who have participated in the "EB-5" program, which grants lawful permanent resident ("LPR") status in the United States to those who make qualifying investments under the Immigrant Investor Law ("IIL"), 8 U.S.C. §§ 1153(b)(5), 1186b; 8 C.F.R. §§ 204.6, 216.6.[1] Appellants complain that in 1998, after their investment proposals and business plans had been approved and they and their dependents had moved to the United States, the Immigration and Naturalization Service ("INS") changed the rules of the EB-5 program. Appellants contend that the INS applied these new rules to reject their applications at a stage in the process that called only for confirmation that they had fulfilled their part of the originally approved bargain. The government counters, inter alia, that new amendments to EB-5 in November, 2002 render the instant case moot and establish a new exhaustion requirement for some plaintiffs.
 
 
 2
 We hold that the recent amendments to EB-5 neither render this case moot nor establish an additional administrative appeal that plaintiffs must exhaust before obtaining judicial review. We hold further that the district court erred in finding that the claims of six Appellants were not ripe for adjudication and, therefore, that the district court should analyze whether a plaintiffs' class should be certified. Finally, we hold that the district court correctly rejected the motion to dismiss the retroactivity claim on the pleadings. It erred, however, in remanding to the INS. Because the analysis involves solely questions of law, we conduct the retroactivity analysis ourselves and conclude that the 1998 changes in the EB-5 rules are impermissibly retroactive as applied to the evaluation of Appellants' petitions to remove the conditions on their permanent residency.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 3
 Appellants have applied to become lawful permanent residents ("LPRs") under the EB-5 program, which grants such status to Immigrant Investors who create jobs for United States workers.[2] EB-5 requires prospective Immigrant Investors to file "I-526" petitions seeking approval of their submitted investment and business plans. After approval, Immigrant Investors and their dependents may enter the country as conditional LPRs. EB-5 requires the Immigrant Investors to file a second petition, an "I-829," between 21 and 24 months after the first petition. The INS is to approve the I-829 petition, and grant unconditional LPR status, if it finds that the petitioner made no material misrepresentations in the I-526 petition and complied with the EB-5 requirements. 8 C.F.R. §§ 204.6, 216.6.
 
 
 4
 The INS approved Appellants' initial I-526 petitions between July 1996 and July 1997. Upon approval, Appellants and their families moved to the United States with conditional LPR status. However, Appellants' I-526 petitions contained features that the INS now believes contravene the terms of the IIL program. For example: 1) Appellants were not partners at the inception of the limited partnerships in which they invested, 2) they were guaranteed the right to redeem their full investments after they received permanent residency, 3) they were guaranteed a return on their investments, 4) their promissory notes were insufficient because they were valued at face value and did not adequately reveal the personal assets securing the notes, and 5) they were permitted to make balloon payments to their limited partnerships or to continue making payments on their promissory notes beyond the end of their two-year conditional residency periods.[3] At the time the INS approved Appellants' I-526 petitions, these features were not considered by the INS to be disqualifying, but the INS has since declared that by structuring their investments in these ways Appellants had transformed them into loans.
 
 
 5
 AIS, the private agency that had recruited Appellants and channeled their investments into the limited partnerships, had conferred with the INS to ensure its investment packages were acceptable. It made some changes as a result of its inquiries, and was assured that any further changes in the IIL would involve notice and comment rulemaking and apply prospectively. Ultimately, however, the INS instead established new rules for EB-5 applicants through a set of "precedent decisions" rejecting the appeals of other new applicants' I-526 petitions. The pertinent case for our purposes is Matter of Izummi, 22 I. & N. Dec. 169, Interim Decision (BIA) 3360, 1998 WL 483977 (1998), which held inter alia that Immigrant Investors' I-526 petitions could not be approved if the Immigrant Investors were not partners at the inception of a partnership or if their investment plans featured a redemption agreement or related provisions. Had the criteria announced in these decisions been in effect at the time Appellants filed their I-526 petitions, the petitions would not have been approved.
 
 
 6
 The precedent decisions were issued subsequent to the INS's approval of Appellants' I-526 petitions. However, the INS applied the new criteria to the Appellants' I-829 petitions. Prior to the district court hearing, it denied Appellant Yi Yuan Chiang's petition, as well as those of other similarly-situated non-plaintiffs, and placed the six other Appellants' petitions on indefinite "administrative hold." The INS argues that, based on the precedent decisions, a review of Appellants' I-829 petitions will not allow it to certify that Appellants have complied with the legal requirements of EB-5.
 
 
 7
 Appellants brought suit to force consideration of their I-829 petitions based solely on the criteria that were in effect when their I-526 petitions were approved. They argue that the INS should review the I-829 petitions only for whether they made material misrepresentations in their I-526 petitions and whether they executed their proposed plans. Appellants asked the district court (1) to estop the INS from applying its current interpretation of EB-5 to their I-829 petitions because it had approved their I-526 petitions, (2) to rule that the INS did not follow required Administrative Procedure Act notice and comment procedures for changing its rules governing EB-5, and (3) to rule that applying the new interpretations of the EB-5 law and regulations promulgated in the precedent decisions to their I-829 petitions would be impermissibly retroactive. They also sought certification as a class action.
 
 
 8
 The INS challenged the justiciability of Appellants' claims and moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c). The district court dismissed the claims of all petitioners except Chiang as not ripe and dismissed the motion for certification of a plaintiffs' class as moot. It granted the government's 12(c) motion on Chiang's estoppel and APA claims, but denied the motion on the retroactivity claim, holding that an analysis applying the factors presented in Montgomery Ward & Co. v. FTC, 691 F.2d 1322 (9th Cir.1982), was appropriate. It remanded this claim to the INS for the agency to develop the record and conduct such an analysis.[4]
 
 
 9
 Appellants appeal the rulings on ripeness, mootness as to class certification, and the dismissal of their APA and estoppel claims. In its counterclaim, the government appeals the remand to the INS for a retroactivity analysis. The government also asserts that this court has no jurisdiction to consider Chiang's claim because 8 U.S.C. § 1186b mandates that appeals be pursued solely through the INS's administrative appeals process; it contends that the substantive issues raised by Chiang may reach this court only after being rejected by the INS in a removal proceeding. Appellants argue that this court has no jurisdiction to hear the government's counterclaim because the remand to the INS is not a final order.
 
 
 10
 On November 2, 2002, after this appeal was filed, Congress enacted the "21st Century Department of Justice Appropriations Authorization Act." Pub.L. No. 107-273, 116 Stat. 1758. "Subtitle B" of the act amended the Immigration and Naturalization Act and created a new class of "eligible aliens" who, like Appellants, had obtained approval of their I-526 petitions between January 1, 1995 and August 31, 1998, had conditional LPR status, and had filed their I-829 petitions on time. Under the statute, these eligible aliens may have their I-829 petitions approved under relaxed standards. If their I-526 petitions contained no material misrepresentations and their conditions were satisfied, they are given additional time, up to when the Attorney General makes his determination as to their eligibility, to bring their business ventures into compliance with the EB-5 program as changed by the new precedent decisions. Subtitle B also provides that aliens like Appellant Chiang, whose I-829 petitions have already been rejected, may reopen their cases by filing for reconsideration by January 1, 2003.
 
 
 11
 The government argues that Appellants' claims are moot because the November 2002 "Subtitle B" amendments grant all appropriate relief in this case. It further argues that Chiang's claim should be dismissed for failure to exhaust his administrative remedies if he did not meet the January 1 deadline for invoking the new appeal procedures of Subtitle B. Finally, the government argues that the appeals of all Appellants but Chiang were not ripe for consideration by the district court because the INS had not yet denied their I-829 applications.
 
 
 12
 We consider these arguments in turn.
 
 II. ISSUES PRESENTED ON APPEAL
 A. Subtitle B
 1. Mootness
 
 13
 Mootness is a question of law reviewed de novo. Biodiversity Legal Found. v. Badgley, 284 F.3d 1046, 1053 (9th Cir.2002). A case properly brought in the first instance is rendered moot when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979). The party asserting mootness carries a heavy burden of establishing that no effective relief remains for the court to provide. GATX/Airlog Co. v. United States District Court, 192 F.3d 1304, 1306 (9th Cir.1999). Were Appellants' only claims that they were denied permanent LPR status because they purportedly violated EB-5's requirements by entering limited partnerships subsequent to their formation, the government would have a strong argument for mootness. But the crux of this case, and the focus of the INS's concern, is the presence of redemption agreements and related provisions in Appellants' investment plans. Appellants' I-829 petitions still stand to be rejected, under Subtitle B, if they are not in compliance with the INS's current construction of EB-5 in this respect as well.[5] Because this court has the capacity to grant relief by declaring that the ban on redemption agreements and related provisions could not be applied to Appellants at all, this case is not moot.
 
 2. Exhaustion
 
 14
 Appellants have sought to certify a class action. The government argues that the claim of anyone whose I-829 petition was denied, but who did not file to reopen his or her case by January 1, 2003, should be dismissed as unexhausted; he or she would of necessity thus be excluded from such a proposed class.[6] In deciding whether such petitioners must be excluded from any certified class, we must ask whether and how exhaustion should apply when a new law grants a class of applicants 60 days after its enactment to initiate a new appeals process or else waive all further right to pursue administrative or judicial relief, including pending judicial relief. Whether administrative remedies must be exhausted is a question of law reviewed de novo. Rumbles v. Hill, 182 F.3d 1064, 1067 (9th Cir.1999).
 
 
 15
 a. Does Subtitle B establish a new exhaustion requirement? We do not face the question here of whether Congress may enact legislation explicitly extinguishing the right of a class of plaintiffs to sue the government by creating a new administrative remedy that must be invoked within a limited time period to preserve the right. The government's argument is that, by setting a 60-day limit, Congress did so implicitly. Even if Congress could preempt civil suits against the government by suddenly setting imminent deadlines for plaintiffs to avail themselves of such administrative channels in order to retain standing,[7] it does not follow that the courts should apply the principle of exhaustion to require that outcome where Congress's intent to do so is at best implicit. We avoid the issue here because we need only apply well-established principles addressing retroactive application of law.
 
 
 16
 In the government's view, while Subtitle B granted Chiang and those similarly situated new rights, it also removed others: Chiang gained the right to pursue a new administrative remedy, but immediately lost the right to pursue permanent residence under the rules extant when his I-526 petition was approved. He also would lose the right to pursue relief of any kind if he failed to file a petition by January 1, 2003. Because Congress did not explicitly express its intention to make the statute retroactive, we must ask if Subtitle B, so construed, had an impermissible retroactive application upon Chiang and others whose I-526 approvals are jeopardized by the rejection of their I-829s and the expiration of Subtitle B's deadline. If we find an impermissible retroactive application, we must construe Subtitle B not to impose a new exhaustion requirement on appellants and those similarly situated.
 
 
 17
 b. Applicable principles of retroactivity analysis: Retroactive application of statutes is disfavored in the absence of clear contrary Congressional intent. See, e.g., Martin v. Hadix, 527 U.S. 343, 352, 119 S.Ct. 1998, 144 L.Ed.2d 347 (1999); Landgraf v. USI Film Prods., 511 U.S. 244, 270, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Whether a statute has a retroactive effect is a fairly straightforward question: it is retroactive if it alters the legal consequences of acts completed before its effective date. Miller v. Florida, 482 U.S. 423, 430, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Specifically, a statute has retroactive effect when it "takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past." Landgraf, 511 U.S. at 269, 114 S.Ct. 1483. In considering a law's retroactive effect, the court's analysis is to be guided by three "familiar considerations" that the Supreme Court has clearly enunciated: reasonable reliance, fair notice, and settled expectations. Id. at 270, 114 S.Ct. 1483.
 
 
 18
 As the Supreme Court emphasizes in INS v. St. Cyr, 533 U.S. 289, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001), the test set forth in Landgraf "`does not purport to define the outer limit of impermissible retroactivity'" but instead "simply describes several `sufficient,' as opposed to `necessary,' conditions for finding retroactivity." Id. at 321 n. 46, 121 S.Ct. 2271 (quoting Hughes Aircraft Co. v. United States ex rel. Schumer, 520 U.S. 939, 947, 117 S.Ct. 1871, 138 L.Ed.2d 135 (1997)).[8] In short, Landgraf requires that a court conduct a two-pronged analysis: first, the court must ask whether a law imposes new negative consequences on past actions; second, the court must ask whether those consequences are imposed without fair notice, or in a manner that undermines reasonable reliance or upsets settled expectations.
 
 
 19
 c. Application of retroactivity principles to Subtitle B: Subtitle B, as portrayed by the government, attached a new disability to the previous actions of Immigrant Investors who entered into limited partnerships after their initial formation by establishing a deadline for them to file a form initiating administrative review of their case or lose all right to seek relief. It also imposed a new exhaustion requirement on eligible aliens whose I-829 petitions were rejected for any reason. These actions eliminated what we conclude below is the right of an Immigrant Investor whose I-829 petition had been rejected due to application of the precedent decisions to appeal that decision to district court. This retroactive application of Subtitle B was imposed in violation of the right to fair notice.
 
 
 20
 The government knew precisely which individuals had had their I-829 petitions rejected based on the rules from the precedent decisions; it had done the rejecting. It also had, at the least, relatively current information about how to contact them. And yet, beyond publication of the potentially life-altering one-sentence deadline within a massive appropriations bill, the government indicated at oral hearing that it took no steps to notify these individuals that they had no more than sixty days to preserve any possibility of judicial review of their case. The government may not take away such rights without fair notice. We do not explore whether providing a longer amount of time, or announcing the new policy more prominently, or individually notifying those to be affected — since the government had that information readily at hand — would have been necessary or sufficient to constitute fair notice. But taking the right of judicial review away from perhaps unrepresented individuals by imposing such a precipitous deadline is a prohibited retroactive application of law.
 
 
 21
 We therefore construe Subtitle B not to impose an additional exhaustion requirement on those whose I-829 petitions had been rejected before the statute's effective date, but who did not file to reopen their cases by the January 1, 2003 deadline. On remand, the district court must consider certifying classes without respect to whether prospective class members have or have not availed themselves of the opportunity for relief under Subtitle B.[9]
 
 
 22
 B. Ripeness of claims of Appellants other than Chiang
 
 
 23
 Ripeness is a question of law reviewed de novo. Daniel v. County of Santa Barbara, 288 F.3d 375, 380 (9th Cir.2002). It turns on the constitutional consideration of "whether the plaintiffs face a realistic danger of sustaining a direct injury" from the challenged act, City of Auburn v. Qwest Corp., 260 F.3d 1160, 1171 (9th Cir.2001) (internal quotation marks omitted), and on the prudential considerations of whether the issue is fit for decision and whether parties will suffer hardship if the court declines to consider it. Id. at 1172-73. This court "does not require Damocles's sword to fall before we recognize the realistic danger of sustaining a direct injury." Id. at 1171. Here, the INS has already failed to act upon Plaintiffs' I-829 petitions within the 90-day period required by statute. 8 C.F.R. § 216.6(c)(1). It is undisputed that Appellants' I-829 petitions will be rejected if the standards of the precedent decisions are applied to them.
 
 
 24
 As the district court noted, ordinarily under Reno v. Catholic Social Services, Inc., 509 U.S. 43, 113 S.Ct. 2485, 125 L.Ed.2d 38 (1993) a formal denial of an alien's application on the disputed grounds is required, but if denial is certain review will not be barred based on ripeness. Id. at 69-71, 113 S.Ct. 2485 (O'Connor concurring). In Freedom to Travel Campaign v. Newcomb, 82 F.3d 1431, 1436 (9th Cir. 1996), this court expressly adopted the "firm prediction" rule from Justice O'Connor's Catholic Social Services concurrence, which eliminates the need to await an inevitable application of a regulation to a plaintiff before determining a claim to be justiciable.
 
 
 25
 Prudential considerations also favor review. The issues remaining are legal and do not require further factual development. The uncertain state of the law is sufficient hardship to prompt judicial review, see Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 581, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985), but Appellants' businesses are also suffering from lack of clarity about their prospects. Delay injures Appellants' hopes for obtaining permanent residence status, and if their position is indeed futile, they would best abandon their present course and start again. Nothing is gained from postponement, either from the aliens' or the government's perspective. Accordingly, the district court erred when it dismissed the claims of the Appellants other than Chiang as not ripe for review. Ripeness is not a bar to this action, and the district court must consider the merits of class certification.
 
 
 26
 C. Subject matter jurisdiction to review denial of Chiang's I-826 petition
 
 
 27
 The government argues that EB-5 sets forth an administrative process requiring that appeals of the rejection of I-829 petitions take place solely through removal hearings, and thus that the district court had no jurisdiction to hear Chiang's claim. This raises the questions of whether the APA requires that these administrative review procedures be exhausted before an appeal is brought to the district court, and whether the administrative review process offered by the INS is adequate. Subject matter jurisdiction is a question of law reviewed de novo. Delta Savings Bank v. United States, 265 F.3d 1017, 1024 (9th Cir.2001).
 
 
 28
 1. Must administrative review be exhausted?
 
 
 29
 The district court properly asserted jurisdiction to review the denial of Chiang's I-829 petition because 8 U.S.C. § 1186b (INA § 216A) does not state that review of such a denial must occur exclusively in removal proceedings. Absent language foreclosing immediate judicial review, a district court's subject matter jurisdiction is unaffected by the availability of non-mandatory administrative procedures. See, e.g., Darby v. Cisneros, 509 U.S. 137, 154, 113 S.Ct. 2539, 125 L.Ed.2d 113 (1993) ("[W]here the APA applies, an appeal to `superior agency authority' is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review.") (emphasis in original). The government reads the language of 8 U.S.C. § 1186b(c)(3)(D) — "[A]ny alien whose permanent residence status is terminated under subparagraph (C) may request a review ... in a proceeding to remove the alien" — as establishing an exclusive review process. However, while this language permits an alien to elect initial administrative review, it does not expressly mandate that course.
 
 
 30
 Given the courts' deference to agency interpretation of their governing statutes, however, see Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 842-45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), we do not end our analysis here. If the INS's interpretation of § 1186b(c)(3)(D) were to be accepted, administrative review would still be required only if that review provides an adequate remedy. See Bowen v. Massachusetts, 487 U.S. 879, 901, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (finding that a statute providing for administrative review does not bar relief, since the "doubtful and limited relief available ... is not an adequate substitute for review in the District Court.") We therefore consider the adequacy of the administrative review.
 
 
 31
 2. Is administrative review adequate?
 
 
 32
 In Winterberger v. General Teamsters Auto Truck Drivers & Helpers, 558 F.2d 923 (9th Cir.1977), we stated:
 
 
 33
 Ordinarily, a court possesses jurisdiction to review an ... administrative-like proceeding whether or not the aggrieved party has exhausted administrative remedies. But as a matter of sound policy, courts usually decline to intercede and in most instances act within their discretion in doing so. However, there are occasions when a court is obliged to exercise its jurisdiction and is guilty of an abuse of discretion if it does not, the most familiar examples perhaps being when resort to the administrative route is futile or the remedy inadequate.
 
 
 34
 Id. at 925 (citations omitted). In assessing whether this court has jurisdiction, "the Administrative Procedure Act's generous [judicial] review provisions must be given a hospitable interpretation." Abbott Laboratories v. Gardner, 387 U.S. 136, 140-141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) (internal quotation marks omitted). The Supreme Court has repeatedly upheld an aggrieved party's prompt access to the district court when it provides greater redress and broader opportunity to develop a claim than is available in a more limited statutory scheme. See, e.g., Bowen, 487 U.S. at 904, 108 S.Ct. 2722; McNary v. Haitian Refugee Ctr., Inc., 498 U.S. 479, 496-97, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991); Bowen v. Michigan Acad. of Family Physicians, 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).
 
 
 35
 Here Appellants' access to removal proceedings is an inadequate substitute for prompt access to judicial review. The denial of an I-829 petition is a final and nonappealable agency action, see 5 U.S.C. § 704, with immediate concrete injuries. Upon termination of LPR status, aliens must surrender their "Permanent Resident Cards" upon request and cannot lawfully work in the country without special documentation that can be revoked at any time. 8 C.F.R. § 216.6(d)(2). The clock begins to run on their period of "unlawful presence" in the country, which can lead to their exclusion from the country for up to ten years. 8 U.S.C. § 1182(a)(9)(B). Furthermore, because the INS need not commence removal proceedings immediately, conditioning aliens' access to an Article III court on their first having undergone removal proceedings would leave them in limbo in the interim. Should they lose an appeal, final orders of removal carry an additional ten-year bar to seeking readmission to the United States. Id. § 1182(a)(9)(A)(ii).
 
 
 36
 Removal proceedings are not designed to develop an adequate record for judicial review of the issues at stake for these appellants, but rather to test the veracity of the petition, which is not what is at issue in this case. See id. § 1186b(c)(3)(D) ("[T]he burden of proof shall be on the Attorney General to establish ... that the facts and information... alleged in the petition are not true with respect to the qualifying commercial enterprise.")
 
 
 37
 The immigration judge in removal proceedings cannot hear the sorts of claims at issue here, which include whether equitable relief is available, whether APA notice and comment was required before promulgating new rules, and whether constitutional claims challenging the rule of law applied in their case. Such claims lie outside the scope and jurisdiction of the immigration judges and the BIA. For example, the BIA has held that even though district courts may apply the doctrine of equitable estoppel against the INS — relief requested in this case — administrative judges may not. Matter of Hernandez-Puente, 20 I. & N. Dec. 335, 338-39, 1991 WL 353520 (BIA 1991). The BIA has likewise disclaimed authority to adjudicate APA claims, also at issue in this case. See Matter of Hector Ponce De Leon-Ruiz, 21 I. & N. Dec. 154, 165, 1996 WL 23408 (BIA 1996) ("[The BIA does not] assess[] regulatory compliance with the APA, ... [and should make no] observations in this area where we lack expertise. We ourselves are exclusively a creature of the Attorney General's regulations, and we have properly left it to the courts to resolve questions of APA compliance."). Finally, the BIA has also disclaimed authority to consider constitutional claims in removal hearings. See Matter of Cenatice, 16 I. & N. Dec. 162, 166, 1977 WL 39241 (BIA 1977) ("[I]t is not within the province of this Board to pass upon the constitutionality of the statutes it administers, but rather is solely within the power and capacity of the United States courts to declare them unconstitutional."). As a result, removal hearings would not establish a record on the critical issues; statutory appeal would be to our court.
 
 
 38
 The limitation on the scope of removal proceedings is particularly problematic because we would be limited to this inadequate record by 8 U.S.C. § 1252(b)(4)(A): "With respect to review of an order of removal ... the court of appeals shall decide the petition only on the administrative record on which the order of removal is based." Furthermore, 8 U.S.C. § 1252(b)(4)(B) mandates that "administrative findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." Cases requiring factual development beyond the scope of removal proceedings are generally channeled to the district court, which will afford more full appellate review. See, e.g., Mohammadi-Motlagh v. INS, 727 F.2d 1450, 1452-53 (9th Cir.1984) ("The BIA lacked authority to hear and determine these factual issues and did not do so. We are therefore without jurisdiction to consider these claims. They must be raised in the first instance in the district court."). Given the above, we hold that even if the APA did require that administrative remedies be exhausted before recourse to Article III courts, removal proceedings are not adequate for this purpose.
 
 
 39
 3. Ripeness of Chiang's claim.
 
 
 40
 The government argues that Chiang's claim is not yet ripe for adjudication, because he has not yet been subjected to the removal process, and urges that this court wait to rule on this issue until he appeals from a removal order. For reasons expressed in our previous discussion of ripeness, and because we find the removal process inadequate to the task at hand, we hold that Chiang's appeal was ripe for adjudication, and that the district court properly exercised jurisdiction over it.
 
 D. Improper Retroactive Effect
 
 41
 The district court dismissed Chiang's claims that the precedent decisions violated APA notice and comment rulemaking provisions and were barred by estoppel, but it refused to dismiss Chiang's claim that the precedent decisions were improperly retroactive. The district court remanded Chiang's I-829 petition to the INS to apply factors presented in Montgomery Ward & Co. v. FTC, 691 F.2d 1322 (9th Cir.1982) for determining the propriety of retroactively applying the precedent decisions.
 
 
 42
 1. Jurisdiction.
 
 
 43
 Appellants assert that this court lacks jurisdiction to consider the government's counterclaim because the district court's remand to the INS for a retroactivity analysis is not a final and appealable order, but interlocutory. We construe the remand as a decision to require exhaustion of administrative remedies. "The basic purpose of the exhaustion doctrine is to allow an administrative agency to perform functions within its special competence — to make a factual record, to apply its expertise, and to correct its own errors so as to moot judicial controversies." Parisi v. Davidson, 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). Since record development is unnecessary and the INS has no special expertise to do the retroactivity analysis, we interpret the remand to be an offer to the agency to correct its error. We review for abuse of discretion the decision of the court to require exhaustion. See Pension Benefit Guar. Corp. v. Carter & Tillery Enters., 133 F.3d 1183, 1187 (9th Cir.1998).
 
 
 44
 The Supreme Court instructs that final order jurisdiction is to be given a "practical rather than a technical construction," Gillespie v. U.S. Steel Corp., 379 U.S. 148, 152, 85 S.Ct. 308, 13 L.Ed.2d 199 (1964). One justification for hearing interlocutory appeals is to avoid a "totally wasted proceeding below." Stone v. Heckler, 722 F.2d 464, 467 (9th Cir.1983). Here, the INS contends that it has no authority to apply the Montgomery Ward factors outside of a removal proceeding, and no such proceeding has come before it.
 
 
 45
 We are persuaded by the government's argument that, given the INS's stance, a remand to that agency now would simply waste judicial resources. The INS holds fast to its position that it cannot conduct such an analysis outside of a removal proceeding, and there is no need to force it to do so. See Young v. Reno, 114 F.3d 879, 881-82 (9th Cir.1997) (noting exception to exhaustion requirement where recourse within the agency is futile); Winterberger, 558 F.2d at 925. "An abuse of discretion occurs if the court applies the correct law to facts which are not clearly erroneous but rules in an irrational manner." United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir.2001) (internal quotation marks omitted). While the district judge was admirably solicitous of the INS in offering it the opportunity to conduct a retroactivity analysis in the first instance, wasting judicial resources by remanding to the INS for it to do what it firmly states it may not and will not do is irrational, even if well-motivated. The district court was itself fully capable of doing what it asked the INS to do against its will. The remand was thus an abuse of discretion. We accept jurisdiction over the interlocutory appeal to decide the retroactivity claim.
 
 2. Reaching the retroactivity analysis
 
 46
 In refusing to dismiss Appellants' claim on the pleadings, the district court stated:
 
 
 47
 [I]n denying Plaintiff Chiang's I-829 petition, the INS relied largely on principles announced in the Precedent Decisions. In effect, having already approved Plaintiff Chiang's investment program by virtue of its approval of his I-526 petition, the INS effectively changed the rules of the game by judging Plaintiff Chiang's I-829 petition under the Precedent Decisions even though Plaintiff Chiang had not altered his previously approved investment program, and had not acted in a way which would otherwise justify denial of the I-829, but for the Precedent Decisions.
 
 
 48
 The district court's findings of fact are not clearly erroneous. We agree with its consequent analysis. The government raises three arguments as to why a retroactivity analysis is inappropriate, each of which is unavailing.
 
 
 49
 a. Retroactive application is not a "hardship factor". While the government continues to argue that retroactivity is a "hardship factor" that has no place in analysis of I-829 petitions, the district court correctly noted that Montgomery Ward did not involve applying hardship factors, but "a wholly different analysis... that examines degree of burden on the parties." A finding of impermissible retroactivity would not waive compliance with the new EB-5 requirements as a matter of beneficence due to hardship, but would refuse to impose the new requirements because Appellants had the legal right to have their petitions "grandfathered" under the previous standards.
 
 
 50
 b. A finding of retroactive application is not foreclosed by prior case law. We reject the government's contention that the question of improper retroactive application of the precedent decisions against Appellants was resolved in R.L. Investment Limited Partners v. INS, 273 F.3d 874 (9th Cir.2001) ("RLILP") (adopting in full the district court's decision in R.L. Investment Limited Partners v. INS, 86 F.Supp.2d 1014 (D.Haw., 2000)).[10] The RLILP plaintiffs were not situated similarly to Appellants in the instant case: as their I-526 petitions had not been approved, they had no reliance interest comparable to that of Appellants. They challenged the prospective application of the precedent decisions to their new unapproved I-526 applications, on the basis that the INS had violated the APA in changing what they contended was its longstanding policy of allowing redemption agreements and related provisions. By contrast, because Appellants' own I-526 petitions had been approved, and they had acted relying on that approval, a different mix of considerations guide the appropriate analysis. Furthermore, RLILP's holding that the precedent decisions did not "effect a change in existing law" applied only to 8 C.F.R. § 204.6, which governs review of I-526 petitions. The question we face is whether applying the precedent decisions to I-829 petitions effects a change in 8 C.F.R. § 216.6, which governs review of I-829 petitions. This question is analytically distinct from that before the RLILP court.[11]
 
 
 51
 c. I-829 applications need not receive ab initio review. The crux of the government's position is that the Montgomery Ward retroactivity concerns do not apply to EB-5 applications, because EB-5 requires a "fresh demonstration of compliance with statutory standards at the I-829 stage." However, if I-526 approval is decoupled from I-829 approval, then petitioners whose I-526 petitions had been approved would have no reasonable reliance that the rules set out in 8 C.F.R. § 216.6 would not change in midstream. If, on the other hand, approval of the I-526 petition was an official provisional approval of the petitioner's plan, contingent on its effectuation, then a retroactivity analysis is required.
 
 
 52
 The EB-5 statute requires that each I-829 petition "shall contain facts and information demonstrating that — (A) a commercial enterprise was established by the alien; (B) the alien invested or was actively in the process of investing the requisite capital; and (C) the alien sustained [these actions] throughout the period of the alien's residence in the United States." 8 U.S.C. § 1186b(d)(1). In 8 C.F.R. § 216.6(d), examples of the appropriate documentation include tax returns, to show that the enterprise was in fact established; an audited financial statement, to show that the alien had actually invested; and bank statements, invoices, receipts, contracts, business licenses, and payroll records to show that the petitioner had sustained the actions throughout the two year conditional residence period. This is in marked contrast to the documentation requirements of 8 C.F.R. § 204.6(j), governing approval of the I-526 petition. We will not review the several pages of requirements listed in this subsection; suffice it to say that they require a much more comprehensive documentation of the petitioner's plans and resources.
 
 
 53
 The language of 8 U.S.C. § 1186b(d)(1) and the contrast between the documentation requirements of the regulations at each stage of the approval process strongly support the view that I-829 approval is a procedure intended to confirm that the petitioner fulfilled the plan set out in the I-526 petition. The government's contention that I-829 approval proceeds ab initio — and that I-526 approval therefore may not be relied upon as setting forth a plan that, if followed, will lead to I-829 approval — is not sustainable. The government argues that I-526 approval neither guarantees nor predicts I-829 approval, but the latter is clearly untrue. I-526 approval does not guarantee I-829 approval — the petitioner might not successfully "sustain the actions ... throughout the period of ... residence" — but it certainly predicts it. No one obtains I-829 approval without prior I-526 approval. The government provides no reason to believe that the combination of I-526 approval, successful execution of the approved plan, and absence of material misrepresentation in the I-526 petition — all characteristics that Appellants claim apply to them — was not an excellent predictor of I-829 approval up until the precedent decisions appeared.
 
 
 54
 We conclude that Appellants reasonably relied on the application of 8 C.F.R. § 216.6 extant when their I-526 petitions were approved. We conclude that the INS's refashioning of 8 C.F.R. § 216.6 into an independent ab initio assessment of Appellants' satisfaction of the EB-5 program standards raises serious retroactivity concerns.
 
 
 55
 d. Initial retroactivity analysis may be conducted by this court. For the above reasons, we affirm the district court's refusal to dismiss the retroactivity claim. We further conclude that the record is already sufficiently developed to allow us to undertake the retroactivity analysis. The parties briefed the issue of retroactivity and application of the Montgomery Ward factors and argued the issue before the district court. "Although we ordinarily do not consider an issue not passed upon below, the decision to resolve a question for the first time on appeal is one left primarily to the discretion of the courts of appeals.... It is sometimes appropriate for an appellate court to pass on issues of law that the trial court did not consider." City of Auburn, 260 F.3d at 1173 (citations and internal quotation marks omitted). Application of the Montgomery Ward factors is now purely a matter of applying the law. We are as well situated as the district court to perform this retroactivity analysis. We elect to do so.
 
 3. Merits of the retroactivity claim
 
 56
 In Montgomery Ward, this court adopted the five-factor analytical framework set forth in Retail, Wholesale and Department Store Union v. NLRB, 466 F.2d 380, 390-93 (D.C.Cir.1972). This test balances a regulated party's interest in being able to rely on the terms of a rule as it is written against an agency's interest in retroactive application of an adjudicatory decision:
 
 
 57
 Among the considerations that enter into a resolution of the problem are (1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of law, (3) the extent to which the party against whom the new rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party, and (5) the statutory interest in applying a new rule despite the reliance of a party on the old standard.
 
 
 58
 Montgomery Ward & Co. v. FTC, 691 F.2d 1322, 1333 (9th Cir.1982).
 
 
 59
 The present case is one of first impression, which weighs in the government's favor. But the next two factors weigh heavily in Appellants' favor. The INS's history of approving I-829 petitions without respect to the presence of redemption agreements and related provisions was a well established practice. The approval of Appellants' own I-526 petitions containing such provisions shows that this practice continued at least until shortly before the publication of the precedent decisions; the rules introduced in those decisions were an abrupt departure. Appellants also relied on their understanding that their business and investment plans conformed to the requirements of EB-5. They sold businesses, uprooted from their homelands, and moved to the U.S. They had assurance that the redemption agreements and related provisions in their business plans would not obstruct their applications for permanent residency.
 
 
 60
 We now turn to balancing the burdens on the parties. The new regulations impose a substantial burden upon Appellants. Appellants are given a choice: either they invest or commit to reinvest large sums of money immediately, or they and their dependents must leave the United States. The latter course would mean starting the process of applying to the EB-5 program over again, with uncertain results, or possibly subject to bar on re-entry given their deemed unlawful presence in the United States. Either alternative involves substantial sacrifice.
 
 
 61
 The government argues that Appellants have suffered no burden, since they can ask for their money back from the limited partnerships in which they invested. But the burden at issue is not merely whether Appellants can now recoup their investments if they have not already done so. It also involves whether the time and expense put into their good faith efforts to obtain LPR status will have been squandered. The government also argues that to the extent that Appellants severed ties to their home countries, they did so at their own risk and not on the basis of any assurances from the INS. This argument misses the point in an instructive way. Appellants sought no guarantee of success, but a contingent promise that, if they held up their end of the bargain by fulfilling the terms of their approved I-526 petitions, they would obtain the LPR status promised by the EB-5 program. This was not unreasonable.
 
 
 62
 Against the burdens on Appellants weighs the factor of the INS's statutory interest in applying the new rule to these Appellants and those similarly situated. That interest is insufficiently substantial to outweigh the other factors. We do not fault the INS for determining that its earlier approvals of I-526 petitions interpreted the EB-5 program in ways that arguably contravened Congressional intent. It then closed what it considered to be a set of loopholes. We will assume arguendo that its initial policy was mistaken and its remedial efforts justified.
 
 
 63
 The consequences of the INS's mistake are not overwhelming. If a class action is certified, approximately 250 Immigrant Investors and perhaps 350 more of their dependents may be granted permanent residency. The government has never argued that this class of Immigrant Investors did not act in good faith, nor that the efforts they undertook to avail themselves of the EB-5 program were negligible. From Appellants' perspective, the INS's approving and receiving the benefits of their investments, only to renege on the promise of LPR status once those benefits were garnered, must seem very unfair. It is hard to imagine how the INS has a compelling statutory interest in such an outcome. Congress has not repealed the EB-5 program; it still intends for it to continue. The reputation and integrity of the EB-5 program is ill-served by the proposition that INS approval of an I-526 petition as satisfying EB-5's requirements cannot be relied upon.
 
 
 64
 On balance, after applying the Montgomery Ward factors, we conclude that the application of the INS's intended change in the function of I-829 review is impermissibly retroactive as applied to Appellants.
 
 
 65
 4. Implications of the retroactivity analysis
 
 
 66
 Ultimately, the INS's fundamental argument is simply that it is not authorized to certify that Appellants' I-829 petitions satisfy the requirements of EB-5 in light of the precedent decisions. The INS's position that it cannot grandfather Appellants' petitions under its previous construction of EB-5 of its own accord is understandable. But, the INS certainly can do so pursuant to a court order requiring that in reviewing the I-829 petitions of those whose I-526 petitions had already been approved, it may not apply the rules introduced in the 1998 precedent decisions because such action fails the balancing test of Montgomery Ward.
 
 
 67
 Because we rule that the INS may not apply the rules introduced in the precedent decisions in evaluating Appellants' I-829 petitions, we need not address Appellants' estoppel and APA notice and comment claims, as they would afford Appellants no additional relief even were we to reverse the district court.
 
 III. CONCLUSION
 
 68
 All of Appellants' claims were ripe, none were moot, no further exhaustion of the administrative process was necessary, and no statute ousted our jurisdiction. We also have jurisdiction over the government's counterclaim.
 
 
 69
 Retroactive application of the new rules adopted by the 1998 precedent decisions to Appellants' I-829 petitions is impermissible. The INS may not apply the rules established in the 1998 precedent decisions in reviewing the I-829 petitions of those whose I-526 petitions had been approved before those new rules were promulgated. The remaining issue in this case is whether one or more plaintiffs' classes should be certified; we remand back to the district court for that determination. This panel will retain jurisdiction over all future appeals deriving from these claims. Costs are taxed against the United States. The decision of the district court is
 
 
 70
 AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCTIONS.
 
 
 
 Notes:
 
 
 *
 The Honorable David C. Bury, United States District Judge for the District of Arizona, sitting by designation
 
 
 [1]
 The twenty-nine limited partnerships in which the Immigrant Investors invested were plaintiffs in the original action and are listed on the Notice of Appeal, but no appeal is taken from the district court's ruling denying them standing. Six of the Immigrant Investors among them have a total of sixteen dependents who are also nominal Appellants. The term "Appellants" will refer only to the Immigrant Investors
 
 
 [2]
 To qualify for the program, applicants must invest $1,000,000 (or half that amount in certain targeted areas) in new enterprises that create at least ten full-time permanent jobs for U.S. workers. 8 U.S.C. § 1153(b)(5)(A)(i)(iii), (C). Other requirements also apply, including some of those at issue in this case
 
 
 [3]
 For ease of reference, we will refer to all of the contested features of Appellants' investments as "redemption agreements and related provisions."
 
 
 [4]
 This is not a typical remand, but rather an invitation to the agency to reconsider its position that the precedent decisions could be applied to those in Chiang's position in light of the claim of impermissible retroactivity. The INS had previously refused a proposal for a voluntary remand to conduct such an analysis, contending that it had no statutory right to consider "hardship factors" in evaluating I-829 petitions, and stating that such arguments should be raised in removal proceedings. It reiterates these arguments in the current proceedings
 
 
 [5]
 The government argues that Subtitle B affords Appellants the opportunity, even now, to comply with the new regulations. But doing so could require an EB-5 petitioner who had already recouped his investment through a redemption agreement to rapidly collect as much as $1,000,000 and reinvest it in a company under terms that, he argues, were not required of him at the time his I-526 petition was approved. This is not an equivalent substitute for the relief requested from this court
 
 
 [6]
 We do not know whether Chiang filed to reopen his petition by that deadline. But given the number of others who were similarly situated, the question of whether, after enactment of Subtitle B, they must be excluded from any possible proposed class is nevertheless before us. Unlike Chiang, they would not all be involved in a pending lawsuit. The likelihood of some not having known of or met the deadline is high
 
 
 [7]
 Subtitle B is contained in a large appropriation bill. Whether Appellant Chiang and those similarly situated knew of its imminent deadline in sufficient time to react to it, we can say with certainty only that this court did not. The government's motion to dismiss for mootness reached this court on January 21, 2003, precisely twenty days after the deadline expired and twenty days before this case was heard
 
 
 [8]
 No single consideration is essential. Retroactivity analysis underLandgraf requires independent analysis of whatever factors may apply, any of which can ground a finding of impermissible retroactive application. See, e.g., Landgraf, 511 U.S. at 275, 282, 114 S.Ct. 1483 (independently assessing reasonable reliance and fair notice); United States v. Velasco-Medina, 305 F.3d 839, 849-50 (9th Cir. 2002) (independently assessing fair notice and settled expectations). Reasonable reliance may itself be based upon a quid pro quo, as in St. Cyr, 533 U.S. at 320-25, 121 S.Ct. 2271 or merely on assurances as to the current status of the law, see, e.g., Hughes Aircraft, 520 U.S. at 951-52, 117 S.Ct. 1871.
 
 
 [9]
 The government argues that the motion for class certification was untimely under local circuit rules. But the motion was not denied for this reason, and the court never suggested that it would be; the stated reason for dismissal was mootness. In any event, Plaintiffs had filed a motion to enlarge the time for filing, which the district court never ruled upon due to its mootness ruling
 
 
 [10]
 The opinion of our court came down after the district court opinion in this case. Because the argument that the INS's rules were retroactive had not been raised before the district court, the appellate panel rejected it as defaulted without reaching the meritsRLILP, 273 F.3d at 874-75.
 
 
 [11]
 It is also immaterial that, as the government argues, "the final result of an adjudicatory proceeding will [always] have a retroactive effect on the positions of parties to that proceeding," because Appellants were not parties to the precedent decisions. However, the fact that Appellants were not parties to the precedent decisions does not obviate the need for a retroactivity analysis; rules generated through adjudications are not exempt from such analysis